# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110

NEW YORK, NEW YORK 10118

TEL (212) 763-0883  |  FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL  shecker@kaplanhecker.com

## MEMO ENDORSED

April 10, 2020

**BY ECF AND EMAIL**

The Honorable Judge Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**RE:**    **United States v. Jorge Gutierrez, 20 Cr. 126 (LTS)**

Dear Judge Swain:

We respectfully submit this letter in support of our motion for the release of defendant Jorge Gutierrez on bond, pursuant to the Bail Reform Act, during the pendency of his case. Mr. Gutierrez is currently incarcerated at the Metropolitan Correctional Center ("MCC"), unlike his co-defendants who are being held at the Westchester County Correction Facility ("WCCF"). Mr. Gutierrez's experience during the nearly two months he has spent at the MCC has been objectively horrific. He has been on complete or partial lockdown for the entirety of his stay, subjected to unsanitary conditions, and fed only meager food, in the middle of a pandemic. Mr. Gutierrez, understandably, fears for his health and wellbeing. And to make matters worse, counsel has had extreme difficulty communicating with Mr. Gutierrez during a critical juncture of his case, when discovery is being produced and Mr. Gutierrez, who has yet to receive *any* of the discovery, will need to make life-altering decisions in the coming weeks. Because of the extreme threat posed by COVID-19 to Mr. Gutierrez's health, and the continuing violation of Mr. Gutierrez's Sixth Amendment rights, we request that the Court hold a bail hearing for Mr. Gutierrez as soon as practicable. We consent to appearing by teleconference. Mr. Gutierrez would like to be present for such a telephonic hearing, but agrees to waive his appearance if his appearance cannot be arranged quickly by the MCC.

As this Court is aware, at least four inmates at MCC have already tested positive for COVID-19, though the number of actual COVID-19 cases is undoubtedly substantially higher.[1]

---

[1] *See COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited Apr. 10, 2020) (noting that, as of April 9, 2020, four inmates and seven staff members have tested positive for COVID-19); Letter from M. Licon-Vitale, Warden, MCC New York, to the Honorable Roslynn R. Mauskopf (Apr. 3, 2020),

KAPLAN HECKER & FINK LLP

2

While Mr. Gutierrez remains at MCC, his risk of contracting COVID-19 is incredibly high, and far higher than it would be if he were released to live with his family members in Queens. In addition, Mr. Gutierrez's Sixth Amendment right to counsel has been close to a dead letter since he was first incarcerated at MCC on February 21. As we explained during our initial pretrial conference, on February 27, the MCC was fully locked down for eight days due to concerns that a correctional officer had brought a gun into the facility. Tr. at 12, *United States v. Wilson et al.* (S.D.N.Y. Mar. 2, 2020) (No. 20. Cr. 126 (LTS)). A partial lockdown in the facility continued after those eight days, meaning that many inmates were locked down for closer to two weeks. Shortly after this security lockdown, the BOP imposed a nationwide lockdown which prevented the transfer of inmates between facilities and canceled all in-person legal visiting. At MCC, the lockdown also meant that arranging even a phone call with our client became extremely difficult. Simply put, MCC has been unable to reliably schedule legal calls with our client. We had to reach out to MCC on three occasions by email over the course of a week to get a brief, unscheduled call from our client on April 7. As noted, Mr. Gutierrez has not yet received a copy of his discovery, even though counsel received it over three weeks ago.

Given the severity of the growing crisis, the danger to Mr. Gutierrez's health, and the ongoing violation of his Sixth Amendment right to counsel, we respectfully ask the Court to release him from custody on the bail conditions set forth below, which would include living, on home confinement, at his paternal uncle's apartment in Queens, New York, geographically far removed from the area where the Government alleges the unlawful drug conspiracy operated.

## I.    The Bail Reform Act Compels Mr. Gutierrez's Release From MCC

### A.    Mr. Gutierrez Can Rebut the Detention Presumption Because He Neither Poses a Danger to the Community nor Is a Flight Risk

Under the Bail Reform Act, a district court can order pretrial detention only if it concludes "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The court evaluates the record before it in light of the following factors: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person," which includes factors like the person's character, family ties, employment, financial resources, community ties, past conduct, criminal history, and whether the person was on release pending trial; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

In cases where a defendant is charged with certain enumerated offenses, a rebuttable presumption arises that "no condition or combination of conditions" can provide the requisite assurances. 18 U.S.C. § 3142(e)(3). The defendant then "bears a limited burden of production— not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Paulino*, 335 F.

---

https://img.nyed.uscourts.gov/files/reports/bop/20200403_BOP_Report.pdf; Exhibit A, Aff. of Jonathan Giftos, M.D. ("Giftos Aff."), ¶ 21 (Mar. 30, 2020).

KAPLAN HECKER & FINK LLP

Supp. 3d 600, 610 (S.D.N.Y. 2018) (citing *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (citation omitted)). Once the defendant satisfies this burden, the presumption is not eliminated, but it "remains a factor to be considered among those weighed by the district court." *Id.* The Government, which still bears the burden of persuasion, must demonstrate dangerousness by clear and convincing evidence and risk of flight by a preponderance of the evidence. *Id.*

Mr. Gutierrez can rebut the presumption here. Mr. Gutierrez, who is just 22 years old, does not pose a danger to the community. Mr. Gutierrez's criminal history consists primarily of relatively minor drug offenses and a "gang assault in the second degree," which resulted in Mr. Gutierrez being sentenced to probation in August 2017; as we understand the facts of that case, Mr. Gutierrez was not the perpetrator of the assault but was present when it occurred.

In terms of the instant charges, the Government does not contend that Mr. Gutierrez was a leader of the charged conspiracy. Although he is charged as a co-conspirator in connection with Count Two, the 924(c) count, the Government has not alleged that he was the person who brandished or discharged a firearm in connection with the offense. Nor is there any basis for concluding that Mr. Gutierrez, living on home confinement at his paternal uncle's apartment in Queens, would pose a serious risk to the community or that he could not be successfully monitored on pre-trial supervision.

Neither does Mr. Gutierrez pose a risk of flight. If released, Mr. Gutierrez would live with his uncle, Luis Manuel Pasos Ruiz, in Queens. With this family support and separated from the neighborhood where Mr. Gutierrez was living prior to his arrest, there is no basis for concluding that he would not remain in New York to confront the instant charges.

Mr. Gutierrez's parents and three of his siblings live in Indianapolis, Indiana. Despite the distance, Mr. Gutierrez and his family remain close. Indeed, his parents are willing to sign a bond on behalf of Mr. Gutierrez. Mr. Gutierrez also has a two-year-old son whom he helps support and, prior to his arrest, visited frequently. We have been in touch with his family members since we were appointed to represent Mr. Gutierrez and it is clear that his family is committed to helping Mr. Gutierrez stay on the right track.

Mr. Gutierrez therefore neither poses a danger to the community nor a risk of flight. *Paulino*, 335 F. Supp. 3d at 610. Conditions of release including, but not limited to, home detention, electronic monitoring, an appearance bond signed by his parents, and any other conditions that this Court deems appropriate will reasonably assure the appearance of Mr. Gutierrez as required, as well as the safety of the community.

B.   <u>In the Alternative, this Court Should Grant Mr. Gutierrez's Temporary Release</u>

The Bail Reform Act also provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). As courts in this District has already recognized, "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)." *See, e.g.*, *United States v. Stephens*, 15-CR-95 (AJN), Dkt. 2798 at 5, (S.D.N.Y. Mar.

KAPLAN HECKER & FINK LLP

4

19, 2020).

i.    The Coronavirus Crisis

As the Court is well aware, New York is in the midst of a dire and unprecedented public health crisis. As of this memorandum's writing, over 7,000 people have died in New York after contracting COVID-19,[2] and that number is increasing by the hundreds each day.[3]

ii.    The Crisis in Our Prisons

"Prisons are petri dishes for contagious respiratory illnesses."[4] Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing. Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[5] Correctional institutions like MCC have notoriously minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.[6]

Internationally, prisons have proven ripe for the rapid spread of COVID-19. In China, officials confirmed 500 cases of coronavirus in prisons.[7] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[8] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir

---

[2] *Hospitalizations for Coronavirus Are Nearly Flat in N.Y., but 799 More Die*, N.Y. TIMES, https://www.nytimes.com/2020/04/09/nyregion/coronavirus-new-york-update.html (last visited Apr. 10, 2020) (noting that there have been 7,067 total deaths in New York State).

[3] *1,200 Dead in N.Y. and Cuomo Says Worst Is Still to Come: Live Updates*, N.Y. TIMES, https://www.nytimes.com/2020/03/30/nyregion/coronavirus-new-york-update.html ("Gov. Andrew Cuomo, briefing reporters on Monday, said that the worst of the coronavirus outbreak was yet to come, even as another 253 people died in the state in a 24-hour period.") (last visited Mar. 30, 2020).

[4] *Letters to the Editor: A Prison Doctor's Stark Warning on Coronavirus, Jails and Prisons*, L.A. TIMES (Mar. 20, 2020), https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, https://doi.org/10.1086/521910.

[5] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[6] *See* Giftos Aff. ¶ 23.

[7] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus as More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, BUS. INSIDER (Feb. 21, 2020, 5:11 PM), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[8] Claudia Lauer & Colleen Long, *US Prisons, Jails on Alert for Spread of Coronavirus*, ASSOCIATED PRESS (Mar. 7, 2020), https://apnews.com/af98b0a38aaabedbcb059092db356697.

KAPLAN HECKER & FINK LLP                                                    5

detention amid increasingly deteriorating conditions defies basic human decency."[9]

Here, too, leaders have called for a reassessment of the need for pretrial detention in many cases. On March 20, 2020, the New York City Bar Association released a statement urging "local, state and federal authorities to take steps to lower the number of individuals incarcerated in New York State in an effort to prevent the spread of COVID-19 through our jail and prison system."[10] With regard to the federal system, the statement recommended that "[f]ederal trial judges [] consider utilizing their authority under 18 USC § 3142(i) to grant 'temporary release' to people for a 'compelling reason' during the duration of this health crisis."[11]

On March 25, 2020, a letter issued by District Attorney's offices around the country, including those in New York County and Kings County, underscored the urgency of the situation, observing that if our prisons "become breeding grounds for the coronavirus, it will not only impact those incarcerated, but our entire community," and recommending that leaders "work together to implement concrete steps in the near-term to dramatically reduce the number of incarcerated individuals and the threat of disastrous outbreaks."[12]

New York City has heeded that advice, releasing hundreds of inmates from Rikers Island due to its severe infection rate.[13] According to the New York City Department of Corrections, 167 inmates have tested positive for COVID-19 at Rikers.[14] Its infection rate per 1,000 people, at 3.60%, is higher than the infection rates of New York City; Wuhan, China; and Lombardy, Italy.[15] And in neighboring New Jersey, the state hit second-hardest by COVID-19, Chief Justice Stuart Rabner signed an order authorizing the release of 1,000 people from its jails.[16]

     iii.     Lack of Preparedness and Dire Conditions at the MCC

MCC has proven incapable of protecting the health and safety of defendants in its custody. Even prior to the COVID-19 crisis, the MCC was on a full lockdown for what effectively amounted to a two-week period, during which inmates, including Mr. Gutierrez, had

---

[9] Jennifer Hansler & Kylie Atwood, *Pompeo Calls for Humanitarian Release of Wrongfully Detained Americans in Iran Amid Coronavirus Outbreak*, CNN (Mar. 10, 2020), https://www.cnn.com/2020/03/10/politics/mike-pompeo-iran-release-detained-americans-coronavirus/index.html.

[10] *Prisoner Release Guidance Statement*, NEW YORK CITY BAR ASS'N (Mar. 20, 2020), https://s3.amazonaws.com/documents.nycbar.org/files/COVID19_Prisoner_Release_Guidance_Statement_FINAL.pdf.

[11] *Id.*

[12] *Joint Statement from Elected Prosecutors on Covid-19* (Mar. 25, 2020), https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf.

[13] Jan Ransom & Alan Feuer, *"We're Left for Dead": Fears of Virus Catastrophe at Rikers Jail*, N.Y. TIMES (Mar. 30, 2020, 7:49 PM ET), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

[14] This number does not include people who contracted COVID-19 in custody who have been released. *COVID-19 Infection Tracking in NYC Jails*, LEGAL AID SOC'Y, https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last visited Mar. 30, 2020).

[15] *Id.*

[16] Tracey Tully, *1,000 Inmates Will Be Released from N.J. Jails to Curb Coronavirus Risk*, N.Y. TIMES (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

KAPLAN HECKER & FINK LLP

no access to family members or attorneys, while law enforcement searched for a loaded gun brought into the facility, it appears, by a correctional officer.[17] Federal Defenders of New York clients reported to attorneys that mice and water bugs ran through the units as guards unblocked holes in walls and vents that inmates had stuffed with clothing to prevent pests. Inmates on one unit were forced to share one toilet among twenty-six people, and prevented from washing their clothing: prime conditions for the spread, rather than containment, of infectious disease. On other units, toilets overflowed in two-man cells, spreading raw sewage. Inmates with serious medical conditions, including AIDS and anemia, were denied medications or medical care. Female inmates were denied feminine hygiene supplies. No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran. Inmates reported that they were not given a change of clothes for up to a week, received only an average of one shower per week, and had no soap in their cells.[18]

Up until three weeks ago, the MCC had not met even the most basic recommendations of the CDC for preventing the spread of the COVID-19. The prison had no screening mechanism in place for staff or visitors, other than self-reporting. Staff were not wearing face masks or gloves. The MCC had no hand sanitizer available, and no soap, hot water, or paper towels in the visitors' bathroom. Nor did the MCC have any testing for COVID-19 available.

On March 13, 2020, in response to the growing crisis, the BOP announced that it would suspend all social and legal visits for 30 days and implement screening for new inmates. But prohibiting visits to correctional facilities is insufficient to stem the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[19] With each additional arrest comes increased risk of spreading the virus in MCC. Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions.

Reports indicate that at least four inmates have tested positive for COVID-19, and that they are being housed in the SHU.[20] Given what we know about COVID-19, conditions of confinement generally, and the lack of preparedness at MCC, that number is undoubtedly higher.

Seven weeks have passed since Mr. Gutierrez was first detained and admitted to MCC. Even before the COVID-19 crisis hit MCC with full force, Mr. Gutierrez described being hungry, cold, having difficulty sleeping, and living in unsanitary conditions. Tr. at 12. Due to these brutal conditions, we made the extraordinary request of transferring our client to WCCF.

---

[17] *See* Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. DAILY NEWS (Mar. 6, 2020), https://www.nydailynews.com/new-york/ny-mcc-lockdown-accounts-20200306-aws7qoa7ejcozai3i64hms73qi-story.html.

[18] *See United States v. Hollway*, 20-CR-126 (LTS), Tr. 13:1-6 (S.D.N.Y. Mar. 12, 2020).

[19] *Letters to the Editor: A Prison Doctor's Stark Warning on Coronavirus, Jails and Prisons*, L.A. TIMES (Mar. 20, 2020), https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[20] *See* Letter from M. Licon-Vitale, Warden, MCC New York, *supra* note 1.

KAPLAN HECKER & FINK LLP                                                    7

Tr. at 13. Last week, Mr. Gutierrez reported worsening conditions—it was not uncommon to see mice running in his cell. Mr. Gutierrez does not contend that he is a member of the high risk community with respect to COVID-19, but as the Court noted during the bail hearing for co-defendant Miguel Belardo on April 7, 2020, even young and relatively healthy people are at risk of suffering severe complications from this illness.

        iv.    The Federal Judiciary Has Begun to Release Defendants Because of the Threat of COVID-19

On March 19, 2020, Judge Nathan recognized the threat that COVID-19 poses to individuals incarcerated at MCC and released a defendant based who had been denied bail two weeks earlier after his arrest for allegedly possessing a loaded firearm in close proximity to narcotics in violation of his supervised release. *United States v. Stephens*, 15-CR-95 (AJN) (S.D.N.Y. Mar. 19, 2020) (Dkt. No. 2798). Judge Nathan found that "the obstacles the current health crisis poses to the preparation of the defendant's defense constituted a compelling reason under 18 U.S.C. § 3142(i)," noting that the "spread of COVID-19 throughout New York State—and the country—has compelled the BOP to suspend all visits—including legal visits, except as allowed on a case-by-case basis—until further notice." *Id*. at 5. In addition, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19. *Id.*

Over the last several weeks, numerous other judges in this District and in the Eastern District of New York have followed suit, finding that the COVID-19 crisis and/or the BOP's cancellation of visitation can constitute "compelling" reasons under 18 U.S.C. § 3142(i) or "exceptional circumstances" under 18 U.S.C. § 3145(c) and have temporarily released defendants on this basis. For example[21]:

- *United States v. Hudson*, 19 Cr. 496 (CM) (S.D.N.Y. Mar. 19, 2020) (Dkt. No. 72). Judge McMahon released, over Government objection, a defendant charged with narcotics conspiracy, loansharking, and extortion, whose bail application was twice denied due to the danger he posed to the community based on the violent nature of the charges, for 60 days. Judge McMahon cited the COVID-19 crisis and the ensuing difficulty of his attorneys in meeting defendant in preparation for his approaching trial.

- *United States v. Ramos*, 20-CR-04 (ER) (S.D.N.Y. Mar. 19, 2020) (Dkt. No. 21). Judge Ramos released a defendant on bail based on the threat of COVID-19, over the Government's objection and despite allegations defendant had continued to commit felonious conduct and violated his conditions of pre-trial release by seeking to defraud additional investors and communicating with witnesses and victims without counsel.

- *United States v. Barrett*, 19 Cr. 436 (KAM) (E.D.N.Y. Mar. 20, 2020) (Dkt. No. 45). Judge Matsumoto released, through joint agreement of the parties, a defendant charged with Medicare and Medicaid fraud and conspiracy to defraud the United States, because

---

[21] This list is just a selection of the bail applications that have been granted based on the COVID-19 threat to incarcerated inmates.

KAPLAN HECKER & FINK LLP

of the COVID-19 pandemic. The defendant was previously convicted of the same offense and at his bail hearing presented no credible sureties to ensure his appearance.

- *United States v. Brandon*, 19 Cr. 644 (GBD) (S.D.N.Y. Mar. 24, 2020) (Dkt. No. 23). Judge Daniels temporarily released a defendant on his own recognizance due to COVID-19 risk, over the Government's objection that he was a serial violator of the law, who was awaiting sentencing on a guilty plea to escape from federal custody in failing to report to a halfway house, based on an underlying 24-month sentence for violation of his supervised release from a 2009 conviction for access device fraud and identity theft.

- *United States v. Estime*, 19-CR-711 (NSR) (S.D.N.Y. Mar. 25, 2020) (Dkt. No. 15). Judge Román released a 33-year old defendant, facing a cocaine conspiracy charge without any significant medical issues, from Valhalla on a PRB because of COVID-19.

- *United States v. Lopez*, 19 Cr. 323 (JSR) (S.D.N.Y. Mar. 26, 2020). Judge Rakoff denied the Government's request for revocation and detention of a defendant who pleaded guilty to conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and use of a firearm in relation to a drug trafficking crime, finding that "the coronavirus situation does create, on its own, an exceptional circumstance possibility," "the number of [coronavirus cases] has been increasing by a substantial percentage each day," the pandemic "creates a danger if [the defendant] is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States," and "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want."

- *United States v. Witter*, 19-CR-568 (SHS) (S.D.N.Y. Mar. 26, 2020) (Dkt. No. 40). Judge Stein released a defendant, awaiting sentencing for narcotics conspiracy, from MCC, finding that "exceptional circumstances" existed to support his release under 18 U.S.C. 3145(c). Judge Stein noted that "COVID-19 presents an unprecedented public health crisis," that "the virus has infiltrated [MCC]" and that the defendant's age and medical condition placed him at higher risk for severe COVID-19 infection.

- *United States v. Padin*, 20 Cr. 135-5 (JMF) (S.D.N.Y. Apr. 8, 2020) (Dkt. No. 84). Judge Furman temporarily released on bail, over Government objection, a 25-year-old defendant awaiting trial on charges of racketeering conspiracy, narcotics conspiracy, and possession and use of a firearm in aid of a narcotics conspiracy. Judge Furman noted that "in light of the dire circumstances presented by COVID-19; Defendant's asthmatic condition, which exposes him to heightened risk in the even that he contracts the disease; and his lack of substantial criminal history," a "compelling reason" justified the defendant's temporary release.

Given these precedents, and in the extraordinary circumstances in which we find ourselves, we respectfully submit that Mr. Gutierrez can safely be released to the community and that he should be released to ensure his own health and safety.

KAPLAN HECKER & FINK LLP

## II.     The Sixth Amendment Demands Mr. Gutierrez's Release

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. In recognition of this vital right, BOP regulations instruct that detention center wardens "*shall provide* the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.l 17(a) (emphasis added). Mr. Gutierrez has been denied his Sixth Amendment right to assistance of counsel throughout his entire seven-week stay at MCC, and this denial will continue until his release.

A detention facility violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). In *Benjamin,* the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179.

Counsel for Mr. Gutierrez experienced similar delays, the outright cancelation of legal visits for almost the entirety of Mr. Gutierrez's his time at MCC, and the inability to even regularly communicate with Mr. Gutierrez on the telephone. Mr. Gutierrez was arrested on February 21. On Monday, February 24, we attempted to see Mr. Gutierrez at MCC but were unable to see him after waiting for over an hour. Tr. at 11-12. The next day, on February 25, we returned to MCC at 8:00 a.m. and waited for over two hours before seeing Mr. Gutierrez for about 15 minutes. Tr. at 12. Two days later, on February 27, the MCC was fully locked down for eight days, with legal visiting suspended for many inmates for closer to two weeks. Tr. at 12. We were next able to speak to him prior to his singular court appearance on March 12. During that visit, we learned that, during that two-week period: (1) Mr. Gutierrez's food from the commissary and extra clothing were confiscated; (2) Mr. Gutierrez received no hot meals, and ate cereal for breakfast and pieces of bread with bologna or ham, butter, and jelly for lunch and dinner; (3) Mr. Gutierrez had two showers, one of which was five minutes long and soap was not available. Tr. at 12-13. This was all before the MCC was shut down because of COVID-19, and the conditions in which Mr. Gutierrez finds himself have not improved.

MCC is granting legal calls now only on an extremely limited and haphazard basis. While we have been able to speak with Mr. Gutierrez this week to confirm some of the details contained herein, our requests for legal calls went entirely ignored for a week before that, and we had no advance warning of when the legal calls were going to take place.

Perhaps even more concerning is the fact that, seven weeks into his detention, Mr. Gutierrez still has not received a copy of even the minimal amount of discovery that has been produced. And as his case progresses, there is no assurances either that he will be provided with his discovery in a format where he will have an opportunity to review it, or that we will have a workable means for reviewing it with him, since, at present, videoconferencing spots with inmates at the MCC are extremely limited and available only to those with "priority" need for such a conference. In short, we have no confidence whatsoever that we will be able to consult with our client meaningfully about his case over the weeks to come if he is not released from MCC custody.

KAPLAN HECKER & FINK LLP                                    10

## Conclusion

We ask the Court to order Mr. Gutierrez's release on the following conditions: a $25,000 personal recognizance bond, co-signed by his mother and father, home confinement at the home of his uncle, Luis Manuel Pasos Ruiz, in Queens, New York, electronic monitoring, and any other conditions this Court deems appropriate.

As the Second Circuit recently opined, "the careful balancing of needs and rights that [ ] emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time, comprehensive solutions, reached in cooperative institutional discussions." *Fed. Defs. of N.Y. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020).

Mr. Gutierrez's health and constitutional right to counsel can only be protected by his immediate release. The current COVID-19 crisis and MCC's systematic violation of Mr. Gutierrez's Sixth Amendment rights constitute compelling reasons for his release.

Thank you for your consideration of this matter.

The Government must file its written response to the foregoing application by April 14, 2020, at 5:00 p.m. Any reply must be filed by April 15, 2020, at 3:00 p.m.

SO ORDERED.
4/10/2020
/s/ Laura Taylor Swain, USDJ

Respectfully submitted,

Sean Hecker
Anne O'Toole
Valeria M. Pelet del Toro* (New York Bar admission pending)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
shecker@kaplanhecker.com
aotoole@kaplanhecker.com
vpeletdeltoro@kaplanhecker.com

*Counsel for Defendant Jorge Gutierrez*

cc: AUSA Adam S. Hobson (by email)